## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
## WHITE PLAINS COURTHOUSE

| | |
|---|---|
| FRANK SLOBIG and JUDY SLOBIG | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| PHILIP EDWARD GANNUSCIA, DAVID | ) |
| GREGORY BEVAN, JESSICA BJARNSON, | ) |
| THOMAS JAMES RISKAS, III, and | ) |
| AUSTIN BAWDEN | ) |
| | ) |
| Defendants. | ) |

Plaintiffs, FRANK SLOBIG and JUDY SLOBIG (hereinafter variously referred to as "the Slobigs" or "Frank" or "Judy"), by and through their attorneys, Christopher V. Langone and James P. Batson, bring this Complaint against a group of individuals and entities responsible for bilking consumers out of money using "work-at-home" schemes, including so-called internet business consulting and "coaching" scam. For years, Defendants have set up sham and shell entities, and frequently changed the name of these entities after the accumulation of Better Business Bureau ("BBB") complaints, attorney-general complaints and investigations, consumer protection agencies, FTC investigations and injunctions, and/or receiverships. Defendants are criminals and racketeers that have enriched themselves in the amount of tens of millions of dollars at the expense of hundreds, if not thousands of consumers – often the elderly and retired.

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is a civil action arising under the federal laws of the United States, namely 18 U.S.C. §1964 the Racketeer Influenced and Corrupt Organizations Act ("RICO").

2.      Additionally, the Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because Plaintiffs and at least some members of the putative

class are citizens of different states than any of the Defendants, and because the total aggregate matter in controversy exceeds $5,000,0000.00.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Plaintiffs resided in this District when the fraud against them was committed, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

4.      Furthermore, the charge incurred by Plaintiffs as a result of Defendants' fraud was charged to a Citi Credit Card, and therefore records and witnesses evidencing the fraud, and the "charge-laundering" activities engaged in to cover up the fraud, are located at Citi's principal place of business, which is within this district.

5.      Venue is proper at the White Plains Courthouse because Plaintiffs resided in Westchester County when the fraud was perpetrated against them, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in Westchester County.

## PARTIES

6.      Plaintiffs, FRANK SLOBIG and JUDY SLOBIG, ("the Slobigs"), are natural persons, and are married to each other.

7.      The Slobigs are citizens of the State of Indiana, and currently reside in California.

8.      Mr. Slobig is 79 years old.

9.      Mrs. Slobig is 73 years old.

10.     Defendant DAVID GREGORY BEVAN, ("Bevan"), is domiciled in Eagle, Idaho. He was, at relevant times, the owner, and CEO of eCommerce Support. At times relevant to this complaint, acting alone, or in concert with others, he has formulated, directed, controlled, and/or had the authority to control, or participated in the acts and practices set forth in this Complaint.

11.     Defendant JESSICA BJARNSON, ("Bjarnson"), is domiciled in Herriman, Utah, and is married to Defendant Phillip Gannuscia. She was an owner of Novus North, a sham entity previously uutilized in Defendants' scheme, from 2009 to 2011. At times relevant to this complaint, acting alone, or in concert with others, she has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices set forth in this Complaint.

12.     Defendant PHILIP EDWARD GANNUSCIA, ("Gannuscia") is domiciled in Herriman, Utah, and is married to Defendant Bjarnson. At times relevant to this Complaint, he has directed Defendant-related shell entities, such as Dominion, Essent Media, Novus North, and Vensure. At times relevant to this complaint, acting alone, or in concert with others, he has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices set forth in this Complaint. Gannuscia has been involved in operations such as "webfortune vault," "Clicks to Cash," "Education Training Online," "Online Profit Masters," "Income Masters Institute," and "Income Case Machine."

13.     Defendant THOMAS JAMES RISKAS, III, ("Riskas"), is domiciled in Provo, Utah. On behalf of Defendants, he has opened several merchant and other bank accounts that received funds from Defendants and which facilitate Defendants' collection of payments from injured consumers. Riskas manages the scheme's bank accounts to disperse consumer chargebacks and conceal Defendants' practice from issuing banks and law enforcement.

14.     Defendant AUSTIN BAWDEN, ("Bawden"), is domiciled in Utah, and is a citizen of Utah. He conducted initial telephone "interviews" with the Slobigs, and committed numerous acts of fraud intended to induce them to purchase "services" from Mr. Sonnenberg's various entities.

15.     Defendant Riskas is the Registered Agent for "Members Learning Center."

16.     "Members Learning Center" is a d/b/a operated by Defendants in concert, and constitutes the RICO enterprise through which Defendants have conducted their fraud.

17.     Defendants' scam organization was the subject of an action by the FTC for a Permanent Injunction pursuant to Section 13(b) and 19 of the Federal Trade Commission Act, 15 U.S.C. 53(b) and 57b in connection with conduct almost identical to that alleged in this Complaint. *See* U.S. Dist. Utah, Case Number 14-0088. The FTC alleged:

> Defendants operate, as a common enterprise, a multi-phase, multi-million dollar Internet and telemarketing scheme that preys on consumers hoping to earn money via a home-based Internet business. Defendants, using a multitude of corporate names and oft-changing d/b/as rely on deceptive tactics, mail fraud, and wire fraud, to induce consumers to pay thousands of dollars – most of it borrowed on their credit cards – for Defendants' services and related goods. Consumers make these purchases based on Defendants' representations that they will end up with an online business generating substantial revenue. Yet despite Defendants' assurances, most consumers who purchase Defendants' services and related goods do not end up with a functional online business, earn little or no money, and end up heavily in debt.

(See Complaint filed by Federal Trade Commission, 14-0088 [Doc. 1], hereinafter the *Apply Knowledge* case).

18.     The FTC's allegations in the *Apply Knowledge* case are incorporated into this complaint. Relevant allegations in the instant complaint are based on allegations made by the FTC in the *Apply Knowledge* case, which was part of the extensive pre-suit investigation conducted by the Slobigs, and evidence of the pattern of wire and bank fraud that form the basis of the RICO count.

## BACKGROUND

19.     On February 11, 2014, the court in *Apply Knowledge* found that there existed good cause to believe that the Defendants, along with their associates, the "Common Enterprise Defendants" in that case - "have engaged and are likely to engage in acts and practices that violated Section 5(a) of the FTC Act, 15 U.S.C. 45(a) and the FTC Trade Regulation rule

commonly known as the "Telemarketing Sales Rule," 16 C.F.R. Part 310. (See Temporary

Restraining Order, Asset Freeze, Appointment of a Temporary Receiver, Immediate Access, and

Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dist. Utah No. 2:14-0088,

Doc. 16)

20.     Relevant allegations in the instant Complaint are based on the complaint filed by

the FTC in that action, the examination of which was part of the extensive pre-suit investigation

conducted on behalf of Plaintiffs by counsel, and which is evidence of the pattern of wire fraud

and bank fraud that form the basis of the RICO counts.

21.     Defendants have conducted the business practices described herein through an

interrelated and interdependent network of companies that have a common business purpose,

routinely share profits from the illegal and deceptive business scheme described in this

Complaint, and in many instances have common ownership, officers, managers, business

functions, employees, and office locations. Because Defendants so operate, they are jointly and

severally liable.

22.     Defendants shared resources and personnel, collaborated on key aspects of their

operations, and presented themselves to consumers with unified branding and advertising. They

collaborated closely – each one providing services necessary to the success of the entire scheme

and treating each other as divisions or departments, rather than as separate corporate entities. The

factual specifics of such conduct in this case are alleged in detail throughout this Complaint, and

include but are not limited to:

(a)     Use of domain names registered to other entities without using those entity

names;

(b)     Sharing of information;

(c)     Sharing of resources;

(d)     Sharing of employees;

(e)     Recycling of "webinars" and materials;

(f)     The referral networks and payment scheme; and

(g)     The operation of the scheme as alleged herein, and in the *Apply Knowledge* case, which involves many of the same individuals.

23.     As part of the *Apply Knowledge* case, a Temporary Receiver was appointed over a number of corporations, including those operated by Defendants.

24.     The *Apply Knowledge* Temporary Receiver's Report is incorporated into this Complaint by reference. See *Apply Knowledge*, Doc. 60. Relevant allegations in the instant Complaint are based on this Receiver's Report, which was examined as part of the extensive pre-suit investigation conducted on behalf of Plaintiffs by counsel and contains evidence of the pattern of wire and bank fraud that form the basis of the RICO counts.

25.     Several of the entities identified in Temporary Receiver's Report were directly involved in the unfair and deceptive actions that injured the Slobigs, as alleged more fully and specifically herein.

26.     The Receiver conducted an investigation, interviewed relevant individuals, and visited the premises from which the Slobigs were defrauded at 1495 W. 500th, Linden Utah.

27.     According to the Receiver's investigation, Defendants have set up over 240 entities or d/b/as according to the information and documents then available to the Receiver. This is evidence of the pattern of bank fraud that forms the basis of the RICO count.

28.     Defendants and their sham entities have moved, comingled, and laundered money through more than 350 different bank accounts. This is evidence of the pattern of bank fraud that form the basis of the RICO counts.

29.     Defendants and their sham entities have charged consumers' credit cards through over 500 merchant accounts. This is evidence of the patterns of bank fraud that form the basis of the RICO counts.

30.     Defendant Gannuscia and with some of his business associates or former business associates were profiled in the cover-story of Salt Lake Week on June 20, 2012, in a story called: "Phone Predators: Utah's telemarketing wolf packs." *See*,

http://www.cityweekly.net/utah/phone-predators/Content?oid=2161659&showFullText=true. This article is part of the basis of Plaintiffs' allegations, and shows the pattern of conduct that forms the basis of the RICO claim. Accordingly, the allegations of the article are incorporated by reference herein as evidence of the pattern of racketeering activity.

## INDIVIDUAL ALLEGATIONS OF FACT

31.     During the majority of the period relevant to this Complaint, Mr. Slobig was employed at Holy Rosary Parish in Port Chester, New York where he temporarily resided and was an outreach coordinator for approximately 18 months.

32.     Mr. Slobig, a retired priest, has spent the last several decades of his life in public service, participating in charity and missionary work both overseas and at home.

33.     As a result, the Slobigs have lived a modest lifestyle since moving out of their Washington, DC area home in 2006, serving for 15 months with a program for street kids in Quito, Ecuador, then moving about this country in a camper and settling in Indiana, and subsequently in New York, and, currently, California.

34.     Mrs. Slobig worked for several years as an international disaster relief responder and conflict resolution specialist in numerous European, African and Asian countries ravaged by natural disasters or civil strife. Due to health issues discussed below, Mrs. Slobig was unable to earn any income during or since the period relevant to this Complaint.

35.     Mr. Slobig ceased his employment at Holy Rosary Parish in March 2014. The Slobigs subsequently relocated from New York to California in June 2014, and Mr. Slobig has not had gainful employment since.

36.     Other than that which is described above, the Slobigs did then and still do subsist primarily off of income from their social security benefits and the rental of the aforementioned home in Washington, DC, totaling slightly less than $5,000 per month, on average.

37.     In their retirement years with limited income and extensive health expenses, the Slobigs are of the - formally - "middle class" income bracket that now could fairly be characterized as "insurance poor" - nearly half of their monthly income goes to the payment of various insurance premiums.

38.     Beginning in or around the spring of 2010, Mrs. Slobig began experiencing serious health problems, the effects of which are still lingering.

39.     Specifically, Mrs. Slobig was diagnosed with breast cancer in April of 2010.

40.     Subsequently, Mrs. Slobig developed heart problems, and had a pacemaker implanted in January 2011.

41.     On December 31, 2011, while in Panama, Mrs. Slobig suffered a heart attack.

42.     Although Mrs. Slobig has partially recovered, and her cancer is in remission, medical bills stemming from her illness and the lingering side-effects were substantial. As a result, the Slobigs' financial situation was, and still is, strained.

43.     Before their encounter with Defendants as alleged herein, the Slobigs stayed out of debt, paid credit-card and other bills on time, and otherwise maintained good-to-excellent credit.

44.     Here, as in *Apply Knowledge*, Defendants used (and continue to use) deceptive Internet sites to attract consumers interested in work-at-home opportunities.

45.     On July 30, 2013, the Slobigs responded to an on-line promotion - a click-through internet "banner" advertisement - about starting a home-based Internet business.

46.     The promotion indicated that for only $97.00 consumers could learn about how to make money on the Internet, from their home, requiring only 6-10 hours a week.

47.     Neither of the Slobigs had any small business experience prior to viewing this offer, much less experience with any sort of online business.

48.     Nevertheless, the offer appealed to the Slobigs because of the opportunity it purported to present to supplement their limited income with a very modest commitment, and a seemingly low cost of entry.

49.     The banner ad was substantially similar to some of the banner ads preserved by screenshots and submitted as evidence of deceptive conduct in the FTC action.

50.     The promotion prominently displayed logos from major TV networks endorsing the program as having been profiled on TV and other news and press outlets. A similar approach to creating perception of legitimate endorsements is used by Defendant Seed Consulting, LLC, on one of its websites maintained at URL www.businessloan.org.

51.     The banner-ad promotion linked to testimonials from consumers about their purported great success with the program.

52.     On information and belief, these are fabricated testimonials.

53.     One such "testimonial" was from a middle-aged woman who talked about how she earned money by posting URL links in the amount of $15.00 per post.

54.     Consumers who succumbed to Defendants' pitch by making a purchase were quickly bombarded by calls from telemarketers who offered a variety of additional products – known as 'upsells' – that they would claim help consumers establish their business and generate income quickly.

55.     After responding to the promotion, on July 31, 2013, Plaintiffs received a telemarking call from one of the members of the RICO enterprise, Defendant Austin Bawden.

56.     Defendant Bawden claimed to be the head of an entity called E-Business Solutions ("EBS"). But as alleged above, EBS was simply one of many sham entities or d/b/as used by the Defendants and/or their associates. Bawden was actually associated with Members Learning Center, and was a member of the fraud conspiracy.

57.     Bawden advised Plaintiffs that they were highly selective as to the people they worked with, and that they only worked with 2-3% of the people who respond to the initial promotion.

58.     Bawden's representation regarding selectivity of clients was false. Defendants will take money from anyone they successfully ensnare in their scam as alleged herein.

59.     Bawden, on behalf of MLC and the other Defendants, again assured Plaintiffs that their time investment would not exceed 10 hours a week and would yield results promptly. Bawden specifically represented that some clients generated income within 14 days.

60.     The representation that the time required would not exceed 10 hours a week was false, and Bawden knew so at the time he made the representation. Indeed, as alleged later

herein, when Plaintiffs inquired about why they were not making money they were told they had to work harder and "would only get out of it what they put in" or words to that effect.

61.     Bawden advised the Slobigs that they should rely heavily on their personal credit to fund their business. He repeatedly characterized credit as "other peoples' money(s)" – coining an acronym for the concept ("OPM").

62.     The representation that personal credit is "other peoples' money(s)" is false – of course, the Slobigs would be personally liable for paying down the credit extended to them. This false representation was made for the purposes of priming the Slobigs to spend liberally on Defendants' sham services using their personal credit cards without concern for ultimately paying down the debt.

63.     The above is a dangerous attitude with which to approach credit, and is intended to induce victims of Defendants' scheme to harm their personal credit.

64.     As described below, forcing large charges on victims' personal credit early on becomes an integral part on Defendants' overall conspiracy during later phases involving, for instance, illegal credit repair upsells.

65.     During this conversation, Defendants became aware of Mrs. Slobig's medical condition and the Slobigs' limited income.

66.     Defendants were also aware of the Slobigs' lack of small business and online experience.

67.     In reliance upon Bawden's representations and assurances, the Slobigs agreed to engage with a company known as Supplier Source, LLC, which proceeded to further defraud the Slobigs out of thousands of dollars over the course of the next several months.

68.     In a July 31, 2013 phone call that preceded the signing of an "Enrollment Agreement," Supplier Source upsold a "coaching services" package to the Slobigs called "Global Mentors", for the price of $7,095 – a far cry from the initial $97 offered in the online advertisement, which the Slobigs paid as well.

69.     The Slobigs received no "coaching" or other value out of any of the communications that arose from their payment of $97 to Defendants.

70.     Instead, in return for their $97, the Slobigs received an aggressive and deceptive sales pitch for a much more expensive set of "services".

71.     All that the Slobigs "gained" from Defendants' scam offer was the opportunity tto be scammed again.

72.     For their initial $97, all the Slobigs received was the above-referenced sales pitch for the fraudulent "Global Mentors" program.

73.     On July 31, 2013, a person named Andy Nicholes scheduled a "Welcome Call" on Thursday, August 1, 2013 between Plaintiffs and their supposed "coach", an individual named Jason Fackrell. Plaintiffs were sent an email confirming this call.

74.     Around the same time as the welcome call, Nicholes set up a variety of programs and scripts, including "MLC 'ebay' AKI Toolkit" and "Authorize and Volusion"

75.     On information and belief MLC stands for "Members Learning Center," which was associated with Defendant Apply Knowledge, Inc. Examples of the "webinars" offered by Defendant Apply through MLC can be found at: https://www.youtube.com/watch?v=7gqw6NA-Pl0, https://www.youtube.com/watch?v=_HTVWGYDbNc,

https://www.youtube.com/watch?v=xdiegv1f_O4, and

https://www.youtube.com/watch?v=fELNnGy1wn4.

The videos contained in these URLS are incorporated herein as examples of the type (and quality) of materials (and "webinars") found in the MLC.

76. On August 1, 2013, Fackrell made a note that as part of the welcome call he "logged them into the website," "showed them the webinars," and told them to watch the "coaching success" webinars that talk about him and the other coaches.

77. In this same email, Fackrell noted that he was concerned that "Judy asked a ton of questions about the company, [himself] and the people they select. He explained he used "a lot of testimonials to get them excited."

78. Many of the testimonials used by Defendants are false, including those that enticed Plaintiffs to make the initial $97.00 charge at issue.

79. The people identified in the testimonials do not exist.

80. The photos used in the testimonials are stock photos.

81. The testimonials falsely represent the location of the individual by reading the consumer's IP address, and then using a town or city close to the consumer to falsely convey that people in the consumer's own area are successfully using Defendants' programs.

82. See the following link regarding Defendants' testimonial practices. http://ersp.blogspot.com/2013/04/ersp-recommends-affiliate-marketer-yes.html. The factual statements contained in this link, which is a recommendation of the "Electronic Retailing Self-Regulation Program (ERSP), are incorporated herein by reference.

83. On August 12, 2013, Plaintiffs listed their first item on Ebay - and lost money on the sale.

84.     Indeed, it was never intended by Defendants that Plaintiffs would ever profit off of their venture to a significant extent, either within the time period represented by Defendants, or at all.

85.     It is precisely the type of statements alleged in previous paragraphs that were found in the FTC action to be deceptive and illegal, and the basis for an injunction.

86.     Defendants have demonstrated a pattern of pitching their program as a low-risk, short-term investment, and assuring consumers that the company is simply looking for 'success stories' to promote the company.

87.     These "success stories" are a sham - sometimes selling even one single item on Ebay was logged as a success story.

88.     Moreover, consumers who have given positive testimonials ultimately complained or cancelled, yet Defendants kept plugging their "success stories."

89.     Consistent with the pattern of conduct demonstrated in *Apply Knowledge* and this case, Defendants promised consumers such as the Slobigs "an 'expert' personal coach would guide them every step of the way.

90.     The "coaches" promised by Defendants in this case were not experts, but rather were unreliable and inexperienced.

91.     Coaches were not required to have their own business, have run their own business, have experience running online businesses, or even have a college degree.

92.     Consistent with the pattern demonstrated in *Apply Knowledge*, consumers, including the Slobigs in this case, did not receive the expert advice as promised; instead, they received fewer or shorter coaching sessions, with unhelpful, useless and even fraudulent purported "guidance."

14

93.     Mrs. Slobig, who was initially falsely told the program would only require 6-10 hours a week, became exhausted by the "rat race " and enormous time commitment, which was the equivalent of a full time job, if not more.

94.     Nonetheless, she was (and is) a determined and indefatigable worker, who never quits. As a result, her experience drove her to the point of a nervous breakdown.

95.     Mrs. Slobig is historically a person who, like most adults, needs 8-9 hours of sleep nightly for optimal functioning. At the peak of Defendants' scheme, however, she received a mere fraction of that amount, due both to the required time commitment and due to insomnia brought on by the stress inflicted upon her.

96.     Mrs. Slobig's chronic insomnia is ongoing due to the stress brought about by Defendants' betrayal of her family and the resulting damage to her and her husband's finances, including the loss of their retirement fund.

97.     Defendants' conduct therefore caused severe emotional distress.

98.     That the Slobigs would have to spend vastly more time and money on Defendants' program than Defendants represented to them at various points was intentional and a central aspect of Defendants' own profit-generation model.

99.     The Slobigs experienced a litany of emotional abuses in pursuit of upsells were committed as part of and in furtherance of Defendants' initial lead-generation scheme.

100.     As a result of Defendants' conspiracy, Mr. Slobig's credit rating has lost over 175 points on his FICO score, which was almost perfect before being victimized by Defendants

101.     As a result of Defendants' conspiracy, the entirety of the Slobigs' current monthly disposable income is diverted to payments on various debts arising from Defendants' fraud.

102.     In February 2015, the Slobigs met with a personal financial advisor employed with Bank of America.

103.     This advisor informed the Slobigs that based upon their financial situation they could spare no more than $800 per month in disposable income. This amount is consumed entirely by the monthly credit payments that Plaintiffs are currently forced to pay in order to mitigate damages inflicted by Defendants' conspiracy.

104.     The Slobigs' lifestyle has been materially altered by Defendants' scheme. Where before the Slobigs traveled the country in their retirement, often camping in a trailer in State and National parks while renting their Washington, DC, house in order to pay its property taxes, now they are unable to afford the basic expenses of such travel - leaving them unable to afford an apartment and  - essentially stranded in Los Angeles in a family member's extra bedroom - with nowhere to call home.

105.     As a proximate cause of the anxiety and emotional abuse inflicted upon Mrs. Slobig by the entities that Defendants represented would "coach" her, Mrs. Slobig has suffered recurring medical issues requiring outpatient treatment.

106.     In particular, Mrs. Slobig has suffered from chronic sleep deprivation, extreme stress and anxiety resulting in heart arrhythmia and tachycardia, as well as recurring periodic digestive disorder, as a direct result of the stress inflicted upon her by Defendants.

107.     This condition came about as a proximate result of the exacerbating effects that the abuse, emotional distress, and stress inflicted upon Mrs. Slobig by Defendants on her previously existing heart condition.

108.     Defendants were aware of this heart condition, and of Mrs. Slobig's weakened health due to breast cancer, before engaging in the majority of the conduct giving rise to this Complaint.

109.     Mr. Slobig has also experienced extreme emotional distress as a proximate result of Defendants' conduct, in the form of aggravation, stress, worry, and sleep deprivation, which has manifested itself physically in the form of insomnia.

110.     Defendants' conduct has had a profound impact upon the lives and lifestyles of the Slobigs, whose finances have been ruined and whose retirement has been dominated by the deleterious effects of Defendants' fraud.

111.     Plaintiffs bring this suit seeking compensation for all of the extensive harm, including but not limited to the damages enumerated above, that Defendants have inflicted upon them through misrepresentations, unconscionable acts, and otherwise abusive behavior targeted specifically at the elderly and others on fixed income.

## COMMON ALLEGATIONS OF FACT

112.     As detailed in the allegations above, Plaintiffs have been defrauded by what amounts to a loosely-affiliated association in-fact of business consulting services and the individuals behind their corporate veils.

113.     Defendants specifically target their fraud at elderly and retired individuals who they know hope to supplement fixed incomes with part-time entrepreneurism.

114.     The Federal Trade Commission has already sued many of the Defendants for their participation in the business services fraud racketeering conspiracy alleged in this Complaint. This case is No. 2:14-cv-00088 pending in the United States District Court for the District of Utah.

115.    At one point during that case, the court imposed an asset freeze upon Defendants

and appointed a temporary receiver in relation thereto.

116.    Plaintiffs are not the only individuals to be victimized by Defendants'

racketeering conspiracy.

117.    Defendants' online business coaching scam has been in operation and garnering

consumer complaints online since at least 2012, and even earlier using other "shell" companies

even before that.

118.    For instance, a consumer described Defendants' pitch as of March 5, 2013 – made

by an individual he identified as "Simon" – as follows:

> He told me the requirements for this program are:
> •  To spend only about 10-15 hrs/per week on the computer on line
> •  To be teachable
> •  To invest some money (only money makes money)
> •  And to be able to make decisions quickly
> *.  He talked about drop shipping, affiliate marketing, described a perfect
> product, explain SEO – Search Engine Optimization for my web site and
> many more."

119.    According to this consumer, "Simon" described a payment schedule similar to

that into which the Slobigs ultimately were defrauded:

> He then wanted me to draw a line on the paper and mark the Day 1 (when I invest
> $6,895), Day 30 (when I pay only minimum payment roughly $120 but to make
> $800), Day 60 to make another minimum payment of $120 but make $2100) Day
> 90 to make minimum payment of $120 but make $3-4,000) and finally Day120 to
> make a minimum payment and make 97% of my investment. […]He then told me
> that this is a proven business and they would teach me how to make lots of money
> in short time. Being without the job, almost desperate, I believed the guy that this
> could actually work. All I have to do is follow their instructions. I thought myself
> there are probably lots of people making good money on-line selling products. It
> seemed to be a good opportunity so I gave the guy my American Express card
> number and let him charge me **$6,895.00** only because he verbally guaranteed an
> income.
>
> He stayed with me the whole time while I was signing the contract and when I
> stumbled at the sections that stated 'I agree that no claims of future earnings have

been presented to me by any representative of the company, and that they do not represent I will earn any specific amount of money' because I would not get into this program if I do not make money, he said that this is just standard wordage and he personally guarantee I make money with them, he just can say if it's $5,000 or $20,000/ months – that will depend on me.

120.   This consumer then continued on to describe Defendants' "coaching" experience as "very disappointing" with "no positive direction". The consumer stated that "there is no real coaching to the program" and that "the coach has no clue how to make money at all."

121.   Similarly to the misrepresentations made by Mr. Fackrell to the Slobigs, this consumer's coach also pointed to seemingly fictitious "other clients" as examples of success to ward off suspicions about Defendants' scheme – as described by that consumer:

A month later, to support his "coaching" my coach provided me with someone else user name (dacaamch) to check his activity on e-Bay. Yet my coach did not have any information on this client as where he gets the merchandise from or how much he actually profits from selling on e-Bay and told me he was a client of another coach. He could not provide a user name of his own client. The only thing I could find out was this person's activity (only 20% successful sell of all listings).

122.   Consumers online have described difficulty unwinding which of the Defendant entities are associated with which, indicating that Defendants used names such as "Power Seller College", "Members Learning Source", "DAEUS Financial", "YES", and others interchangeably.

123.   Indeed, consumer complaints on http://www.utahconsumeradvocate.com have indicated that the suspect "entities" and their corresponding Defendant owners have shared the use of various trade names for their purported services, offering various consumers similar iterations of the same scam that victimized the Slobigs.

124.   On information and belief, Defendants used such trade names interchangeably amongst each other, because they did not describe actual services, but were merely buzzwords

designed to deceive consumers into falling victim to their scam – which was the same every time: to convince victims to invest ever-increasing amounts of money in pursuit of financial success that would never come.

125.    The individual Defendants' mutual use of these terms is a product of the association-in-fact in which they were engaged under the cover of their respective corporate entities.

126.    Each of these various aliases plays a role in the individual Defendants' association in fact used by them to perpetrate widespread mail and wire fraud.

127.    For instance, Defendants make use of over 300 different bank accounts in the names of their various shell corporations, and hundreds of different merchant identification numbers.

128.    Defendants use these accounts interchangeably in order to hide their pattern of conduct from regulators, banks, credit card companies, and the public at-large.

129.    For instance, many consumers – including the Slobigs – have noticed that the entities to which credit card payments to Defendants were credited were often different entities than those with which they believed they had engaged, with names they did not recognize.

130.    Other consumers have described high pressure sales tactics regarding purchase of "dropshipper" services – the illusory service which a downstream scammer fooled the Slobigs into paying $12,500 in order to purchase, but which provided no significant benefit to their business.

131.    Moreover, accounts of Defendants' pricing vary as between each other and that experienced by Plaintiff despite similar services being provided, indicating that Defendants' fees

are not based upon any sort of inherent value but rather upon what the potential mark is assessed as likely willing to pay.

132.    The consistency and frequency of the above-described accounts, and dozens of others available on consumer review sites such as ripoffreport.com, indicate that Defendants have engaged in a consistent pattern of fraud since at least 2012, in a manner virtually identical to that seen even earlier than 2012 in the *Apply Knowledge* case.

133.    The FTC *Apply Knowledge* action alleges and presents evidence of the existence of the same association in fact as alleged herein.

134.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of himself and a Class defined as follows:

> "All individuals who clicked on a banner ad that made representations that for less than $100 they could learn about how to make substantial money on the Internet, from their home, requiring only 6-10 hours a week, and who subsequently paid money to entities controlled by Defendants, on or after November 2, 2012"

135.    Excluded from the Class are Defendants, their legal representatives, assigns, and successors, and any entity in which Defendants have a controlling interest. Further excluded are Plaintiff's attorney(s). Also excluded is the judge to whom this case is assigned and the judge's immediate family.

136.    Upon information and belief, there are at least hundreds of persons in the Class, such that joinder of all members is impracticable.

137.    Plaintiff will fairly and adequately represent and protect the interests of the Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this

action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

138.    Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

139.    The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class as a result of the substantially similar misrepresentations alleged herein. Plaintiff and the other Class members have all suffered harm and damages as a result of Defendants' fraudulent conduct.

140.    There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a.   Were Defendants' representations concerning the nature of their services and the purported success of their clients false?

b.   Did Defendants participate in a common enterprise for the purposes of committing fraud?

c.   Did Defendants engage in a pattern or practice of committing wire fraud?

**COUNT I:**
**VIOLATION OF UTAH CODE ANN. § 13-11-4**
**(DECEPTIVE ACTS AND PRACTICES)**

141.    Plaintiffs re-allege and incorporate by reference Paragraphs 1-141 of this Complaint as if fully stated herein.

142.    Utah Code Ann. § 13-11-4(1) provides, in pertinent part, "[a] deceptive act or practice by a supplier in connection with a consumer transaction violates this chapter whether it occurs before, during, or after the transaction."

143.    As detailed throughout this Complaint, Defendants engaged in an extended campaign of manipulation and misinformation directed at the Slobigs for the sole purpose of convincing them to invest in illusory business consulting services that provided no value to them.

144.    This campaign included a litany of express misrepresentations made by Defendants in violation of Utah Code Ann. § 13-11-4(1), many – but not all – of which are detailed in this Complaint.

145.    The Slobigs did, in fact, rely upon these misrepresentations in engaging with, and continuing to do business with, Defendants and other related entities.

146.    Utah Code Ann. § 13-11-4(2)(a) prohibits statements that indicate "that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not."

147.    Defendants violated Utah Code Ann. § 13-11-4(2)(a) in the following ways:

    a.  Including in their online banner advertisements the logos of reputable news organizations with which it had no sponsorship, approval, or affiliation.

    b.  Representing that their "coaches" had been trained as coaches through "coaching college," type program – a program that was illusory and consisted

23

of little more than familiarization with the sophisticated marketing and
solicitation scripts that Defendant used to convince marks to purchase
"services".

148.   Utah Code Ann. § 13-11-4(2)(b) prohibits statements that indicate "that the
subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it
is not."

149.   Defendants violated Utah Code Ann. § 13-11-4(2)(b) in the following ways:

   a.   Including false testimonials either never made or, on information and belief,
        made in exchange for compensation.

   b.   Making the aforementioned representations regarding their associates'
        "coaches college" experience.

150.   Utah Code Ann. § 13-11-4(2)(i) prohibits statements that indicate that "the
supplier has a sponsorship, approval, or affiliation the supplier does not have"

151.   Defendants violated Utah Code Ann. § 13-11-4(2)(i) in the following ways:

   a.   Including in its online banner advertisements the logos of reputable news
        organizations with which it had no sponsorship, approval, or affiliation.

   b.   Representing that its "coaches" had completed specialized training, an illusory
        program that consisted of little more than familiarization with the
        sophisticated marketing and solicitation scripts that Defendant used to
        convince marks to purchase "services."

152.   All of these representations were made in connection with consumer transactions.

153.   Defendants made these misrepresentations intending that the Slobigs rely upon
them.

154.    The Slobigs did, in fact, rely upon these misrepresentations in engaging with, and continuing to do business with, Defendants and other related entities.

155.    Moreover, Defendants' conduct was a component in a broader racketeering scheme, involving crimes including but not limited to mail fraud, designed to ensnare small business owners and induce them into making an ever-increasing series of illusory investments.

156.    This conduct amounts to a months-long pattern of deceptive acts and practices perpetrated by Defendants upon the Plaintiffs.

157.    Defendants' conduct offends numerous public interests, including but not limited to:

    a.   The public interest in preventing systematic consumer fraud, pyramid schemes, and the like deceptively promising illusory future benefit in exchange for exorbitant up-front fees;

    b.   The public interests in preventing mail and wire fraud;

    c.   The public interest in preventing elder abuse scams; and

    d.   The public interest in combating criminal racketing conspiracies related to each of the above.

158.    Utah Code Ann. § 13-11-19 provides for a private right of action for the recovery of actual damages and attorneys' fees for persons injured by a defendant's violation of §13-11-4.

159.    Plaintiffs sustained actual damages as a proximate result of Defendants' conduct, including but not limited to fees paid as a result of fraud, damage to personal credit, aggravation, emotional distress, illness, and physical injury.

## COUNT II:
## VIOLATION OF THE RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATIONS ACT

160.    Plaintiffs re-allege and incorporate by reference Paragraphs 1-141 of this Complaint as if fully stated herein.

161.    Each of Plaintiffs is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

162.    Each of the RICO Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

163.    The association-in-fact described by the Temporary Receiver in the FTC action cited herein, and alleged above, is an enterprise related to the marketing of purported internet business consulting services. This association-in-fact does business as "Members Learning Center."

164.    In concert with the each other, Defendants conducted and/or participated in a scheme to defraud aspiring part-time small business entrepreneurs out of thousands of dollars in fees for illusory services that were never and in some cases could never have been provided, and which Defendants had no intention of providing.

165.    At all times relevant to this Complaint, the enterprise described herein was engaged in, and their activities affected, interstate commerce. The facilities of interstate commerce include the United States mails, highways, and telephone, modern internet, and facsimile lines.

166.    On numerous occasions, Defendants used or caused to be used interstate telephone wires in furtherance of, and for the purpose of executing the scheme to defraud. The use of the wires includes, but is not limited to:

    a.   Telephone calls made to Plaintiffs by Defendants or their employees in which false representations were made;

    b.   Making numerous other false representations to Plaintiffs via email;

    c.   Placing or causing to be placed deceptive internet banner advertisements that purported to offer business consulting services for the price of $97, when such "services" consisted entirely of efforts to upsell more expensive, and also illusory, "coaching" packages.

167.    Each use of interstate wires in connection with the scheme to defraud constitutes the offense of wire fraud as proscribed and prohibited by 18 U.S.C. § 1343.

168.    These uses of interstate mails and wires were also done in order to commit fraud in violation of N.Y. Gen. Bus. L. §349(a).

169.    The criminal activities described above were all done in furtherance of Defendants' scheme to defraud.

170.    Continuity is established because the predicate acts were committed against numerous consumers over a period of at least two to three years, since early 2012, as evidenced by the litany of consumer accounts described above.

171.    Continuity is also established by the evidence presented in the *Apply Knowledge* Receiver's Report which describes how Defendants' operation was a high-volume one for which he had developed a comprehensive process for committing fraud across many successful attempts over a long period of time.

172.    Defendant's conduct therefore constitutes a violation of 18 U.S.C. §1962(c).

173.    Plaintiffs were directly injured by Defendants' violations of, 18 U.S.C. §1962(c).

## COUNT III:

## VIOLATION OF N.Y. GEN. BUS. L. § 349 (DECEPTIVE ACTS AND PRACTICES)

174.    Plaintiff re-alleges and incorporates by reference Paragraphs 1-141 of this Complaint as if fully stated herein.

175.    Plaintiff re-alleges and incorporates by reference the allegations contained in Count I of thus Complaint as if fully stated herein.

176.    N.Y. Gen. Bus. L. §349(a) provides, in pertinent part, that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

177.    N.Y. Gen. Bus. L. §349(h) provides for a private right of action for the recovery of actual damages, punitive damages, and attorneys' fees for persons injured by a defendant's violation of §349(a).

178.    As detailed throughout this Complaint, Defendants made a litany of misrepresentations about the nature, value, and success rate of their scam "services."

179.    These misrepresentations included but were not limited those made in connection with internet banner advertisements such as the advertisement that ensnared the Slobigs.

180.    Defendant made these misrepresentations intending that the Slobigs rely upon them.

181.    The Slobigs did, in fact, rely upon these misrepresentations in engaging with, and continuing to do business with, Defendant and other related entities.

182.    Moreover, Defendants' conduct was a component in a broader racketeering scheme, involving crimes including but not limited to mail fraud, designed to ensnare small business owners and induce them into making an ever-increasing series of illusory investments.

183.    Defendants' conduct offends numerous public interests, including but not limited to:

   a.   The public interest in preventing systematic consumer fraud, pyramid schemes, and the like deceptively promising illusory future benefit in exchange for exorbitant up-front fees;

   b.   The public interests in preventing mail and wire fraud;

   c.   The public interest in preventing elder abuse scams; and

   d.   The public interest in combating racketeering conspiracies related to each of the above.

184.    Plaintiffs sustained actual damages as a proximate result of Defendant's conduct, including but not limited to fees paid as a result of fraud, damage to personal credit, aggravation and emotional distress, and personal injuries sustained by Judy Slobig.

   WHEREFORE, Plaintiffs Frank Slobig and Judy Slobig, by and through their attorneys, respectfully pray for the following relief:

   A.   An Order certifying this action as a class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as lead Class Counsel;

   B.   An award of treble damages;

   C.   An award of punitive damages;

   D.   An award of reasonable attorney fees and costs; and

   E.   Any such other relief that this Court deems appropriate and just under the circumstances.

## **JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

                                              Respectfully submitted,

                                              FRANK and JUDY SLOBIG

By:

                                              /s/James P. Batson

                                              *Their attorney.*

James P. Batson
8 Bedford Road
Katonah, NY 10536
(914) 523-2278
jamespbatsonlegal@gmail.com

Christopher V. Langone **(PRO HAC VICE)**
332 S. Michigan St., 9th Floor
Chicago, IL 60604
(607) 592-2661
langonelaw@gmail.com